UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELIAS MANUEL CUSTODIO,<br><br>               Plaintiff,<br><br>vs.<br><br>ASHLEY DOWELL, SANDY JONES, LISA BOSTAPH, RICH WILLIS, KAREN NEILL, CORNEY DENNIS, R. DAVID MOORE, MIKE MATTHEWS, JANIE DRESSEN, DIANA CARNELL, PAROLE HEARING OFFICER, and IDAHO COMMISSION OF PARDONS,<br><br>               Defendants. | Case No. 1:21-cv-00351-BLW<br>Case No. 1:21-cv-00337-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

       Plaintiff Elias Manuel Custodio alleges that the Idaho Commission of Pardons and Paroles ("ICPP" or "CCOPP") denied him and other Hispanic applicants parole based on race or national origin in violation of the Fourteenth Amendment of the United States Constitution. Dkts. 3 and 9. Pending before the Court is the ICPP Defendants' Second Motion for Summary Judgment, filed on June 26, 2024. Dkt. 85. On February 18, 2025, the Court addressed final issues related to Plaintiff's discovery issues and access to legal documents. Dkt. 88. Plaintiff was ordered to file a response to the pending Motion for Summary Judgment no later than March 5, 2025. *See id*. Plaintiff has filed nothing further in response, and the deadline for doing so has passed.

**MEMORADUM DECISION AND ORDER - 1**

Accordingly, the Court will rule on the pending summary judgment motion on the record that is currently before the Court.

### 1. Standard of Law

Summary judgment is appropriate when a party can show that, as to a claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that material facts are not in dispute, a party may cite to particular parts of the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences that can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

Pro se inmates are exempted "from *strict* compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's

**MEMORADUM DECISION AND ORDER - 2**

form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution mandates that "all persons similarly circumstanced shall be treated alike" by governmental entities. *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). However, "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940).

An equal protection claim may be established by showing (1) that actions of the defendants had a discriminatory impact, *and* (2) that defendants acted with an intent or purpose to discriminate based upon a plaintiff's membership in a protected class. *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003); *Lee v. City of Los Angeles*, 250 F.3d 668, 686–87 (9th Cir. 2001). In equal protection cases on issues such as jury venire selection and Title VII hiring, Courts have relied on statistics to prove the first factor, discriminatory impact.

As to second factor, discriminatory intent or purpose, the United States Supreme Court has given specific guidance for applying equal protection principles in the criminal sentencing context, where discretion governs decisionmaking. *See McCleskey v. Kemp*, 481 U.S. 279 (1987). In *McCleskey*, the plaintiffs relied on a detailed professional statistical analysis ("the Baldus study") to bolster their claims that the death penalty was applied with an unequal hand to Black defendants who had white victims. Despite the

**MEMORADUM DECISION AND ORDER - 3**

compelling results of the Baldus study,[1] the Supreme Court rejected the equal protection claim, explaining:

> McCleskey's statistical proffer must be viewed in the context of his challenge. McCleskey challenges decisions at the heart of the State's criminal justice system. "[O]ne of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder." *Gregg v. Georgia*, 428 U.S. 153, 226, 96 S.Ct. 2909, 2949, 49 L.Ed.2d 859 (1976) (WHITE, J., concurring). Implementation of these laws necessarily requires discretionary judgments. Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused. The unique nature of the decisions at issue in this case also counsels against adopting such an inference from the disparities indicated by the Baldus study. Accordingly, we hold that the Baldus study is clearly insufficient to support an inference that any of the

---

[1] The study performed by Professors David C. Baldus, Charles Pulaski, and George Woodworth ("Baldus") was described, in part, as follows:

> Baldus … divided the cases according to the combination of the race of the defendant and the race of the victim. He found that the death penalty was assessed in 22% of the cases involving black defendants and white victims; 8% of the cases involving white defendants and white victims; 1% of the cases involving black defendants and black victims; and 3% of the cases involving white defendants and black victims.
>
> Baldus subjected his data to an extensive analysis, taking account of 230 variables that could have explained the disparities on nonracial grounds. One of his models concludes that, even after taking account of 39 nonracial variables, defendants charged with killing white victims were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks. According to this model, black defendants were 1.1 times as likely to receive a death sentence as other defendants. Thus, the Baldus study indicates that black defendants, such as McCleskey, who kill white victims have the greatest likelihood of receiving the death penalty.

481 U.S. at 286–87.

**MEMORADUM DECISION AND ORDER - 4**

>   decisionmakers in McCleskey's case acted with discriminatory purpose.

*Id*. at 294–97.

Here, the Court concludes that the general *McCleskey* admonition—warning against relying on a bare statistical analysis in a highly-discretionary criminal sentencing context—applies to the highly-discretionary parole consideration context. Any statistical showing of disparate impact on Hispanic inmates must be accompanied by a showing that ICPP decisionmakers acted with a discriminatory purpose in denying Hispanic inmates parole. The United States Court of Appeals for the Third Circuit recognized the difficulty of proving an equal protection violation in parole consideration: "A parole board's individualized assessment is merely a reasoned 'prediction[] of future behavior' about a particular individual, so by itself it cannot make two people, let alone entire groups of offenders, similarly situated." *Stradford v. Sec'y Pennsylvania Dep't of Corr*., 53 F.4th 67, 76 (3d Cir. 2022) (alteration in original) (quoting *Conn. Bd. of Pardons v. Dumschat,* 452 U.S. 458, 464 (1981) (parole due process claim context)).

   2. **Discussion**

The Court has issued several Orders addressing the merits of Plaintiff's claims in the context of ruling on requests for preliminary injunctive relief, discovery disputes, and earlier motions for summary judgment. Several times, the Court has informed Plaintiff that his evidence does not meet the threshold to proceed to jury trial on the narrow issues in this case, and that he is not permitted to proceed on a claim that the ICPP wronged him in his parole denial, because that claim is barred by *Heck v. Humphrey*, 512 U.S. 477

**MEMORADUM DECISION AND ORDER - 5**

(1994), discussed in more detail below.[2] Rather than repeat all of the Court's reasoning why Plaintiff has not stated or supported an equal protection claim, the Court will incorporate its other Orders by reference here (Dkts. 68, 82, 99) and discuss in detail the most recent argument and evidence submitted in support of the Second Motion for Summary Judgment. *See* Dkts. 85 through 98.

In support of the Second Motion for Summary Judgment, Defendants argue that Plaintiff has not demonstrated a statistically significant disparate impact, nor has he provided facts that there was purposeful discrimination—both key elements of an equal protection claim.

### A. *Discriminatory Impact*

Plaintiff relies upon two forms of evidence to show discriminatory impact—spreadsheets of parole grant/denial cases compiled by Idaho Department of Correction (IDOC) Research Analyst Juyoung Choi and a parole grant/denial multiple regression analysis performed by Principal Evaluator Ryan Langrill of the Office of Performance Evaluations (OPE) for the state of Idaho.

---

[2] In the Initial Review Order, the Court determined:

> Plaintiff can pursue his allegations as a civil rights claim without having shown that his parole revocation has been invalidated only if success in his case would not implicitly invalidate revocation of his parole. The Court will liberally construe the Complaint as one that does not seek a reversal of his parole denial (which would be barred by *Heck*), but only seeks a new hearing that employs new procedures that include checks and balances to ensure that parole decisions are not being made based on race or nationality factors.

Dkt. 16 at 6.

**MEMORADUM DECISION AND ORDER - 6**

During the early phase of discovery, IDOC Research Analyst Juyoung Choi compiled certain raw data about parole grants and denials that fell within the time frame authorized by the Court. From this raw data, Choi created two spreadsheets summarizing parole grants and denials during the designated time frame, Exhibits G and H. Dkts. 85-10 & 85-11. Exhibit G is titled "Statistics for All Crimes." Dkt. 85-10 at 1. It is a summary of 4,031 parole cases. Exhibit H is titled "Statistics for Murder/Manslaughter Crimes." Dkt. 85-11 at 1. It is a summary of 632 parole cases within this category of crimes. Plaintiff has analyzed this data, but the Court earlier rejected his analysis based on a *Greenholtz I* analysis (*see* discussion below).

After Defendants were compelled to produce more records, Plaintiff identified a potential dispute of material fact in the aforementioned multiple regression analysis conducted by Langrill—it showed that being Hispanic correlated with a 4.3% lower probability of parole. The Court denied Defendants' first summary judgment motion and ordered more explanatory and statistical information from the parties. Dkt. 82.

Defendants submitted additional explanations and statistical analyses from Choi and Langrill. Dkts. 85-3, 85-9. Importantly, these experts explain that the 4.3% statistic was derived from a "multiple regression analysis for all crime types for the years 2016 and 2017… intended to identify patterns in parole decisions, given the recent implementation of guideline scores as part of the Justice Reinvestment Initiative." Dkt. 85-1 at 3.

Here, too, Plaintiff is trying to establish a *pattern* of discrimination. However, the 4.3% statistic is not significant here because it was found in a study identifying results,

**MEMORADUM DECISION AND ORDER - 7**

not causes. In this case, *causes* are principally at issue—is there a practice or procedure that parole commissioners follow or implement that causes Hispanics to be denied parole disproportionately? Or is the outcome not due to discrimination at all, but a unique combination of each potential parolee's individual factors that caused the potential parolees to be denied parole, resulting in the 4.3% statistic?

Langrill recognized the difficulty of trying to determine a cause for the 4.3% statistic because "the data set did not include the numerous other factors the commissions consider in making parole decisions." *Id*. at 3. Those other factors can include:

> 1) [the] seriousness of and aggravating factors involved in the crime, 2) mitigating factors involved in the crime or related to the offender's circumstances, 3) prior criminal history of the offender, 4) failure or success of past periods of supervision on parole or probation, 5) institutional history, including overall behavior, involvement in programming, institutional employment, custody level at the time of the hearing, and disciplinary and corrective action, 6) evidence of the offender's development of a positive social attitude and willingness to fulfill the obligations of a good citizen, 7) information or reports regarding the offender's physical or psychological condition, 8) the strength and stability of the offender's proposed parole plan, including adequate housing and employment, and 9) the results of the offender's validated risk and needs assessment.

Dkt. 85-2, Affidavit of IDOC counsel Franziska Mueller (relying on IDAPA 50.01.01.250.01(c), Rules of the Commission of Pardons and Parole, available at https://parole.idaho.gov/wpcontent/uploads/2023/09/500101_07212023-RULES-final-for-sub.pdf (accessed June 24, 2024)). Based on the fact that these additional factors were not included in the multiple regression analysis that produced the 4.3% figure, Langrill was unable "to determine what factors, if any, being Hispanic correlated with; he was not

**MEMORADUM DECISION AND ORDER - 8**

able to determine whether being Hispanic caused the lower probability of a parole grant." Dkt. 85-1 at 3. Defendants' first motion for summary judgment was denied, with instructions to produce a more relevant statistical analysis and explanation to address the 4.3% figure, if Defendants desired to assert entitlement to summary judgment.

Choi has newly conducted a statistical "z test," designed to "compare populations and determine whether statistical differences are significant." Dkt. 85-1 at 4. Other cases show that the z-test is well-known and widely-accepted. *See In re: Petrobras Sec. Litig.*, 312 F.R.D. 354, 369 (S.D.N.Y. 2016) (the Court is convinced that the z-test is a well-established and sound statistical technique), *aff'd in part, vacated in part sub nom*. (on class certification grounds), *In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).

The same z-test, explained the same way, was used in *Hispanic National Law Enforcement Association NCR v. Prince George's County*, 535 F. Supp. 3d 393 (D. Md. 2021):

> The second methodology is a general statistical calculation known as a "Z-Test" which evaluates the probability that observed differences between groups occurred by chance alone. As relevant here, if the Z-Test results in a figure with an absolute value above 1.96—either below -1.96 or above +1.96—there is less than a five percent chance that the difference in promotion rates between white officers and Black officers, or between White officers and Hispanic officers, is due to chance, and the difference is deemed to be of "statistical significance." J.R. 573.

*Id*. at 401; *see id*. at 402 (finding statistically significant differences in promotion rate z-scores of -2.59, -3.09, and -3.31).

**MEMORADUM DECISION AND ORDER - 9**

Similarly, in *Isabel v. City of Memphis*, No. 01-2533 ML/BRE, 2003 WL 23849732 (W.D. Tenn. Feb. 21, 2003) (unpubl.), the court relied on a z-test to find a statistically significant score:

> The Z-test for independent proportions showed that white candidates passed the test at about a rate of 90%, or .8947, and African Americans passed the test using the cut score of 66 at a rate of 74.6 percent. The difference in those percentages is 15 percent, which Dr. DeShon asserted is statistically significant, yielding a Z score of 2.35.

*Id.* at *4.

Here, Choi arrived at a z-score of 0.99185. *See* Dkt. 85-12 at 2-3. This figure falls within the z-test's standard range of being insignificant, as the analyses from other cases confirm. After conducting the z-test, Choi declared that she is 95% confident "there is no significant difference in the grant rates of Caucasian and Hispanic residents." *Id.* at 5.

Another reason that the Choi z-test results appear reliable is that they are similar to results of a *Greenholtz I* analysis, because a z-test compares the same type of data sets. *See* Order, Dkt. 82 at 12-14; Defendants' Memorandum, Dkt. 85-1 at 5. The Court's previous analysis of the same data, based on *Greenholtz I*, demonstrated that the results do not show a significant difference between the number of Caucasians paroled and the number of Hispanics paroled. Dkt. 68 at 12-18. The Court agrees with Defendants that trying to apply the multiple regression analysis resulting in the 4.3% reduction rate in parole grants for Hispanics to Plaintiff's facts is like comparing apples to oranges, while the z-test and the *Greenholtz I* analyses compare apples to apples.

**MEMORADUM DECISION AND ORDER - 10**

Having reviewed Defendants' briefing on the new summary motion, including the expert's new testing and explanation of the results, the Court concludes that Plaintiff has not shown a genuine dispute as to a material fact by pointing to the multiple regression analysis outcome (conducted for a different purpose) that being Hispanic correlated with a 4.3% lower probability of parole. The z-test and the *Greenholtz I* analysis are methods that fit the circumstances of this case and address the particular issue at hand—whether there is a significant disparity in parole grants among the races. These tests do not show a significant discriminatory effect.

Plaintiff earlier pointed to a number of potential parolees he believes were the objects of discrimination based on the Choi spreadsheets. The allegation of discrimination against a class of persons in those instances has been dispelled by the many factors involving each individual's suitability for parole, as shown in their respective parole records. *See* Dkt. 68 at 9-10 & 19-33; Dkt. 82 at 16-21.

To the extent Plaintiff recently asserted that he has found mistakes in the data on Exhibit G and H, and Defendants responded that they had produced all documents they had that might address any mistakes, the Court permitted Plaintiff to explain the mistakes in his response brief. Plaintiff has not filed a response.

### B. *Discriminatory Intent and* **Heck** *Bar Limitations*

As to discriminatory intent, Plaintiff has provided insufficient evidence showing that individual ICPP members, or the members as a group, engaged in decisionmaking based on a discriminatory intent or motive to deny Hispanic inmates parole during the timeframe at issue.

**MEMORADUM DECISION AND ORDER - 11**

Plaintiff turns to comments or errors made in his own parole denial proceeding in an attempt to invalidate that decision, but what evidence he has provided does not support his position that the commissioners had a discriminatory intent (*see* Dkt. 82 at 20), and that type of evidence generally is outside of the body of evidence in this case that is necessarily corralled by *Heck*. In its Order of September 7, 2023, the Court determined that "*Heck v. Humphrey* prevents this Court from determining the propriety of the ICPP's particular decision in Plaintiff's case, it can review only whether the ICPP decisionmaker generally acted in accordance with a policy, procedure, or practice that violated the Equal Protection Clause in denying Hispanic inmates parole." Dkt. 68 at 10. Therefore, "*Heck* mandates that a specific claim that the ICPP's particular parole decision in Plaintiff's case was unconstitutional must be pursued in habeas corpus." *Id*.

Defendants also point out that Plaintiff has not pinpointed any practices or procedures that cause the ICPP to knowingly or unknowing discriminate against Hispanic parole applicants, nor has he suggested alternative procedures that would remedy any alleged discriminatory practices or procedures. Simply because the evidence shows that most ICPP commissioners have not taken the opportunity to engaged in implicit bias or anti-discrimination training does not equate to evidence that the commissioners' decisionmaking was overcome by an autonomic, implicit, or default discriminatory mode against Hispanics applicants. *See* Dkt. 61 at 5. No is there any evidence to show that the reason the ICPP commissioners ignored the option of bias was to continue to engaged in a purposeful pattern of racial discrimination. Plaintiff has not established a causal link among the factors of a lack of training, an alleged discriminatory practice or procedure

MEMORADUM DECISION AND ORDER - 12

(which has not been identified), and an alleged discriminatory impact (which is not supported by the *Greenholtz I* or z-test results).

Accordingly, for the reasons set forth in this Order, as well as the reasons in the Court's previous Orders, Defendants are entitled to summary judgment.

## ORDER

**IT IS ORDERED:**

1. Defendants' Second Motion for Summary Judgment (Dkt. 85) is GRANTED.

2. The Complaint and Supplemental Complaint (Dkts. 3, 9) are DISMISSED with prejudice, except for any claims that are procedurally barred by *Heck v. Humphrey*; those are DISMISSED without prejudice.



DATED: March 24, 2025

B. Lynn Winmill
U.S. District Court Judge